## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

I, James B. Motley Jr., being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with the United States Secret Service (USSS) and have been so employed since April 2000. I have over 11 years of law enforcement experience with an extensive investigative background.  I have received training at the Federal Law Enforcement Training Center, United States Secret Service Rowley Training Center in the techniques and methodology of general law enforcement and white collar criminal investigations.  While assigned to the Charlotte Field Office in North Carolina I was a member of the Money Laundering Task Force and Bank Fraud Squad. I am currently assigned to the Greenville Resident Office, Greenville, SC.  I have participated in the execution of search warrants involving the search and seizure of financial instruments.

2.      The information contained in this affidavit is based, in part, on personal knowledge and observations during the course of this investigation, as well as information provided to me by cooperating sources and other law enforcement agents/officers; additionally, this affidavit is based upon my training and experience as well as that of other law enforcement agents/officers working with me in this investigation.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all of the information about which I, or collectively the other agents involved in this investigation, have knowledge.

### PROPERTY TO BE SEIZED

3.      This affidavit is submitted in support of a warrant to seize the following

property:  $5,676,556.88 from bank account XXXXXXXXXX, in the name of Denarius

Financial Group, maintained at Key Bank (New York account).

## FUNGIBILITY

**Fungible Property Can Be Forfeited**

4.  Your Affiant is advised that, in pertinent part, 18 U.S.C. § 984(a) provides that

in any forfeiture action *in rem* in which the subject property is cash or funds deposited in

an account in a financial institution:

(1) it shall not be necessary for the Government to identify the specific

property involved in the offense that is the basis for the forfeiture; and

(2) it shall not be a defense that the property involved in such an offense has

been removed and replaced by identical property.

Except as provided in subsection (c), any identical property found in the

same place or account as the property involved in the offense that is the

basis for the forfeiture shall be subject to forfeiture under this section.

5.  Your Affiant is also advised that, in essence, Section 984 allows the United

States to seize for civil forfeiture identical property found in the same place where the

"guilty" property had been kept.  See, e.g., United States v. All Funds Presently on

Deposit at American Express Bank, 832 F. Supp. 542, 558 (E.D.N.Y. 1993) ("There is

no reason why fungible property, such as the balance, in a bank account, should

escape forfeiture simply because the property is capable of being moved in and out of

the government's view with great rapidity.  If despite the apparent disbursement of the

property it remains capable of being replaced or reconstituted in identical form at any

time because of its fungible nature, it should remain subject to forfeiture.")  I am advised

that by Section 984(a)(1)(B), therefore, this affidavit need not demonstrate that the monies now in the Denarius Financial Group Canada account at Key Bank, are the particular monies involved in money laundering, so long as the forfeiture is sought for other funds on deposit in those accounts.

## One-Year Limit on Fungibility

6. Your Affiant is further advised that the "fungibility" rule of Section 984(b) cannot reach back in time for an unlimited period. Section 984(b) provides:

No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than one year from the date of the offense.

7. I am advised that Section 984(b) applies so long as the "action" to forfeit the property is commenced within one year from the date of the offense giving the basis for the forfeiture. Here, as described herein, the dates of the offense giving rise to the seizure are within the one year period.

8. While Section 984 does not explicitly define the term "action", the section's legislative history clearly establishes that Congress intended the seizure of property to constitute the "action" to be commenced within one year of the offense in order to obtain the benefit of the application of that section's fungibility rule:

Sec. 984 provides that in cases involving fungible property, property is subject to forfeiture if it is identical to otherwise forfeitable property, is located or maintained in the same way as the original forfeitable property, and not more than one year has passed between the time the original property subject to forfeiture was so located or maintained and the time the forfeiture action was

initiated by seizing the property or filing the complaint, regardless of whether or

not the fungible property was continuously present or available between the

time it became forfeitable and the time it was seized.

Money Laundering Enforcement Amendments of 1991, H.R. Rep. No. 102-28 (Mar. 20,

1991), 1991 WL 42201 at *55. See American Express Bank, 832 F. Supp. at 558

(quoting legislative history to the effect that Section 984 applied to money in seized

accounts to the extent that money involved in money laundering or structuring existed in

those accounts within one year of the seizure).

9. Thus, your Affiant is advised that Section 984 makes the property, which

today is in the Denarius Financial Group Canada account at Key Bank, subject to

seizure and forfeiture to the extent that monies involved in the illegal activity were

located in the accounts in the year preceding the seizure.

## LEGAL AUTHORITY

10. The investigation has revealed that Denarius Financial Group (Denarius)

facilitates the distribution of funds on behalf of www.intertops.com and other websites

that host online gambling activities. Denarius remits payments in the form of wires from

a U.S. Bank account at Key Bank N.A. to numerous other U.S. bank accounts. From

these other U.S. Bank accounts, gamblers located throughout the United States and in

the District of South Carolina are funded. The transfer of funds, in the form of checks

and monetary wire transfers, contain proceeds of illegal online sports gambling in

violation of 18 U.S.C. § 1084. Pursuant to 18 U.S.C. § 1956(c)(7), a violation of 18

U.S.C. § 1084, which is included as a RICO predicate in 18 U.S.C. § 1961(1), is a

"specified unlawful activity."

11. Processing wires that represent the funds derived from illegal online gambling in the manner set forth below constitutes a violation of the money laundering provisions of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i). In addition, by facilitating the distribution of these payments, Denarius is operating in the United States as an illegal money transmitting businesses in violation of 18 U.S.C. §§ 1960(a), 1960(b)(1)(A) and 1960(b)(1)(B).

12. Pursuant to 18 U.S.C. §§ 1960(a), 1960(b)(1)(A) and 1960(b)(1)(B), it is a felony for a business to engage in transmitting money in interstate or foreign commerce (1) without a license in a state where the penalty for operating without a license is punishable by a misdemeanor or a felony; or (2) without being registered with the Secretary of the Treasury pursuant to the requirements of 31 U.S.C. § 5330.

13. Pursuant to 31 U.S.C. § 5330(d)(1)(A), a money transmitting business is defined as any business, other than the United States Postal Service, which provides check cashing, currency exchange, money transmitting or remittance services, or issues or redeems money orders, traveler's checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions comprising the United States financial system.

14. Pursuant to 31 U.S.C. § 5330(d)(2), a money transmitting service includes accepting currency or funds denominated in the currency of any country and transmitting the currency or funds or the value of the currency or funds, by any means

through a financial agency or institution, a Federal Reserve Bank or other facility of the

board of Governors of the Federal Reserve System, or an electronic funds transfer

network.

15. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal,

involved in a transaction or attempted transaction in violation of money laundering

statutes (§ 1956) or in violation of money transmitting statutes (§ 1960) is subject to

forfeiture to the United States, as is any property traceable to such property.

16. Authority for issuing seizure warrants in this judicial district for an account

located in other districts is found in 18 U.S.C. § 981(b)(3) and 28 U.S.C. §

1355(b)(1)(A), which provide that a forfeiture action may be brought in the district court

for the district in which any of the acts or omissions giving rise to the forfeiture occurred.

As a matter of practice, most online gambling websites operate all over the world.  The

bettor accesses the website through downloadable software provided by the operator.

The bettor creates an account with the operator by providing his name, address and

other identifiers.

## ONLINE GAMBLING BACKGROUND

17.    Online gambling and the online gaming industry is essentially a virtual

casino. The websites, which act as the casinos, are located on servers all over the

world, typically outside of the United States.  The gamblers are also located all over the

world.  The gambling sites will accept funds from any person as long as they have

access to the internet.  Once a gambler has submitted funds to the gambling site, he is

able to place bets and gamble online.  This would include gamblers located in the

District of South Carolina.

18.    Pursuant to 18 U.S.C. § 1084(a), federal law prohibits the use of wire communications for the transmission in interstate or foreign commerce of bets or wagers, or information assisting in the placing of bets or wagers, on any sporting event, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers.[1]

19.    Title 18 U.S.C. § 1084(b), however, specifically allows the transmission of wire communications in interstate or foreign commerce for the purpose of placing bets or wagers, if the transmission occurs between two states or other foreign entities where such activity is legal.  Online gaming is illegal in South Carolina pursuant to state statute 16-19-40 which states:

> If any person shall play at any tavern, inn, store for the retailing of
> spirituous liquors or in any house used as a place of gaming, barn,
> kitchen, stable or other outhouse, street, highway, open wood, race field
> or open place at (a) any game with cards or dice, (b) any gaming table,
> commonly called A, B, C, or E, O, or any gaming table known or

---

[1] **Error! Main Document Only.**A recent opinion of the Office of Legal Counsel, United States Department of Justice reviewing this sub-section stated:

> On this reading, all of subsection 1084(a)'s prohibitions serve the same end, forbidding wagering, information, and winnings transmissions of the same scope: No person may send a wire communication that places a bet on a sporting event or entitles the sender to receive money or credit as a result of a sports-related bet, and no person may send a wire communication that shares information assisting in the placing of a sports-related bet or entitles the sender to money or credit for sharing information that assisted in the placing of a sports-related bet.

Op. Off. Leg. Counsel, Vol. 35, pp. 7-8 (September 20, 2011).

distinguished by any other letters or by any figures, (c) any roley-poley table, (d) rouge et noir, (e) any faro bank (f) any other table or bank of the same or the like kind under any denomination whatsoever or (g) any machine or device licensed pursuant to Section 12-21-2720 and used for gambling purposes, except the games of billiards, bowls, backgammon, chess, draughts, or whist when there is no betting on any such game of billiards, bowls, backgammon, chess, draughts, or whist or shall bet on the sides or hands of such as do game, upon being convicted thereof, before any magistrate, shall be imprisoned for a period of not over thirty days or fined not over one hundred dollars, and every person so keeping such tavern, inn, retail store, public place, or house used as a place for gaming or such other house shall, upon being convicted thereof, upon indictment, be imprisoned for a period not exceeding twelve months and forfeit a sum not exceeding two thousand dollars, for each and every offense.

20. Secret Service Agent(s) have had conversations with the South Carolina Attorney General's Office regarding application of this statute to online gambling. According to Senior Assistant Attorney General C. Havird Jones, Jr., this statute "broadly bans gambling and makes violation of the statute a crime. In virtually identical form to the present statute, § 16-19-40 has existed for more than 200 years, and has been consistently enforced by [the South Carolina Supreme Court] through affirmance of numerous convictions thereunder. " Mr. Jones further informed Agent(s) that a position by the United States "that any of the prohibited activities that are addressed in

Section 16-19-40 that are done on line would be a violation that section would be consistent with our interpretation."

21.  In addition to the above-cited statute, the State of South Carolina has other statutory authority specifically prohibiting wagering on sporting events.  Section 16-19-130, South Carolina Code of Laws (1976), states:

Any person within this State who

(1) Engages in betting at any race track, pool selling or bookmaking, with or without writing, at any time or place;

(2) Keeps or occupies any room, shed, tenement, booth, building, float or vessel, or any part thereof, or occupies any place or stand of any kind upon any public or private grounds within this State with books, papers, apparatus or paraphernalia for the purpose of recording or registering bets or wagers or of selling pools;

(3) Records or registers bets or wagers or sells pools or makes books, with or without writing, upon the result of any (a) trial or contest of skill, speed or power of endurance of man or beast, (b) political nomination, appointment or election or (c) lot, chance, casualty, unknown or contingent event whatsoever;

(4) Receives, registers, records or forwards or purports or pretends to receive, register, record or forward, in any manner whatsoever, any money, thing or consideration of value bet or wagered or offered for the purpose of being bet or wagered by or for any other person or sells pools upon any such result;

(5) Being the owner, lessee or occupant of any room, shed, tenement,

tent, booth, building, float or vessel, or part thereof, or of any grounds

within this State knowingly permits the same to be used or occupied for

any of these purposes or therein keeps, exhibits or employs any device or

apparatus for the purpose of recording or registering such bets or wagers

or the selling of such pools or becomes the custodian or depository for

gain, hire or reward of any money, property or thing of value staked,

wagered or pledged or to be wagered or pledged upon any such result; or

(6) Aids, assists or abets in any manner in any of the aforesaid acts, which are

hereby forbidden;

Shall be guilty of a misdemeanor and, upon conviction, shall be punished by a

fine not exceeding one thousand dollars or imprisonment not exceeding six

months, or both fine and imprisonment, in the discretion of the court.

22.  Furthermore, your affiant is not aware of any state in the United States where online

gambling is legal.  Furthermore, the Unlawful Internet Gambling Act of 2006, (Title VIII, 31 U.S.C. §§

5361-5367) is designed to cut off the flow of funds from U.S. gamblers to online gambling websites.

The Act does this by criminalizing the acceptance of U.S. initiated financial instruments by operators

of online casinos, cardrooms and sportsbooks and by prohibiting U.S. financial institutions from

processing transfers of funds to them under regulations to be drawn up by regulators of financial

institutions.

23.    Individuals seeking to gamble over the internet must create and fund an account with

the online casino.  The account must be funded prior to engaging in online gambling.  There are

various methods for funding the accounts, including the use of a credit or debit card. Another method is by a Western Union or Money Gram transfer. These transfers are sent overseas to a third party not directly associated with the online casino. This type of behavior is meant to conceal the true online gambling corporations through the use of shell companies to accept funds from and remit payments to online gamblers.

24.    After a gambler funds his account, the credit will be posted online, and the gambler can begin to wager. The gambler can withdraw funds from his account at any time. When a gambler withdraws funds from his account, the payment can be sent in the form of a check, ACH debit, or a monetary wire transfer.

25.    In this case, Denarius utilizes wire transfers to fund numerous U.S. bank accounts. From these accounts gambling winnings are distributed to online gamblers in the United States. Denarius acts as a money processor by wiring illegal gambling proceeds received from online casinos and gaming websites to smaller "processors" who then directly fund gamblers' personal accounts located in United States banks under the guise of a legitimate business.

## FACTUAL BACKGROUND & PROBABLE CAUSE FOR SEIZURE OF PROPERTY

26.    In February 2011, representatives of Standard Charter Bank reported that between December 3, 2010, and January 12, 2011, they identified 6960 wire transactions sent by Bank Internasional Indonesia on behalf of IXS International Services LTD ("IXS") totaling $5,343,166.28. A subsequent investigation of IXS was initiated by the U. S. Secret Service, Greenville Resident Office. As a result of the IXS investigation, a seizure warrant was applied for on February 25, 2011, in the District of South Carolina. Through March 8, 2011, Standard Charter Bank received 656 wires sent on behalf of IXS from Bank Internasional Indonesia. It is believed by this affiant that the wires, which totaled $879,895.61, were proceeds of illegal online gambling which is in violation of 18 U.S.C. § 1084.

11

27.  It was during both the IXS and related investigations that your affiant developed financial contacts and sources that led to the identification of International General Enterprises Ltd ("IGE"), Quebec Inc. ("Quebec"), and Denarius.

## INVESTIGATION REGARDING IGE and Quebec

28.  The following financial summary was conducted by your affiant for wires sent by Raiffeisenverband Salzburg on behalf of IGE through Wells Fargo Bank NA ("Wells Fargo").

29.  A review of financial documents from Wells Fargo covering the date range of June 29, 2009, through June 28, 2011, identified 4,684 wire transactions sent by Raiffeisenverband Salzburg on behalf of IGE totaling $10,027,079. The outgoing wires were remitted to approximately 1609 different beneficiaries; primarily individuals located in the United States, including the District of South Carolina. Raiffeisenverband Salzburg uses Wells Fargo due to their banking relationship and Wells Fargo's relationship to other, often smaller domestic banks.

30.  On June 30, 2011, an undercover Secret Service Agent in the United States created a player's gambling account using the website www.intertops.com and deposited $249.00 using an undercover VISA credit card.

31.  On July 25, 2011, an undercover Secret Service Agent in the United States used the account he created at www.intertops.com to gamble online and concluded with an ending balance of $188.04.

32.  On August 3, 2011, an undercover Secret Service Agent in the United States requested a payout from www.intertops.com using the wire-to-account option. The undercover Agent was required to provide supporting documentation (picture Identification, photocopy of VISA card, etc.) for the processing department at Intertops to proceed with the wire payment.

33.  On August 16, 2011, an undercover Secret Service Agent in the United States received these proceeds of online gambling in the form of a wire transfer in the amount of $188.04 from IGE

12

located in St. John's, Antigua. Specifically, the wire originated from Raiffeisenverband Salzburg (Bank) and was sent into the United States through Wells Fargo on behalf of International General Enterprises Limited, P.O. Box W427 Woods Centre West Indies, St. John's, Antigua.

34.     Through an open resource search at www.google.com, your affiant was unable to identify a website for IGE. The first and second returned hits revealed a website www.trademarkia.com. This website identified www.intertops.com as being associated with IGE. Intertops is described as a provider of online computer betting services for sports contests, casino play, online poker, etc. Additional open source research into Intertops located the website www.intertops.eu/. A notice located on www.intertops.eu/ states that "we are moving our domain from Intertops.com to Intertops.eu" and that "your existing account is not available at Intertops.eu and there will be no other changes for you in the day-day usage." The sites are interlinked, and continue to offer sports betting, casino play and online poker to gamblers throughout the world, including the United States. Additional websites www.poker.intertops.eu/, www.mrcasinos.com/intertops and others were identified along with multiple reviews and ratings describing the gaming and gambling activities of Intertops. A business address, P.O. Box W427 Woods Centre, St. Johns, Antigua was located for International Gaming and Entertainment Limited which matches the address used by IGE to wire money through Wells Fargo in the United States and to players in the District of South Carolina. IGE appears to be an offshore holding company of International Gaming and Entertainment Limited, a/k/a Intertops.

35. According to all investigative efforts, IGE is an offshore holding company operated by International Gaming and Entertainment Limited and listed by the Kahnawake Gaming Commission (Canada) as a client provider authorization holder. Your affiant and others have conducted online research as well as research through several law enforcement databases. The review of financial documentation supports only the payment of illegal online gambling proceeds by IGE into the United

13

States and the District of South Carolina. No other form of legitimate business was identified.

36. Through continued investigation, including numerous interviews, venue was established in the District of South Carolina. On August 25, 2011, this Court issued warrants directing the seizure of all wires originating from IGE through Wells Fargo for a period of time. Pursuant to the August 25, 2011 warrants, Wells Fargo seized $306,413.36 that was sent from Raiffeisenverband Salzburg (Bank) through Wells Fargo beginning on or about August 26, 2011, through September 7, 2011. Upon information and belief, IGE/Intertops was made aware of the August 25, 2011 warrants and ceased wire transmissions subject to the warrants. Based on interviews and investigation the operators of Intertops began utilizing 9221-8742 Quebec to process payouts for gamblers in the United States and the District of South Carolina.

## INVESTIGATION REGARDING Quebec

37. On August 29, 2011 I spoke with Richard Craig Bradford, a South Carolina resident known to me as someone who regularly gambles on line and uses websites associated with Intertops. Bradford said that he requested another payout from Intertops on August 26, 2011. Bradford said that after the processing fee the total payment he expected to be wired to his account was $865.00. I explained to Bradford that due to an active seizure warrant he would not receive this wire from Intertops. I explained to Bradford that if he waited approximately 7-10 days and then contacted Intertops questioning where his payout was that they would in fact resend it, likely using a different method and/or processor. Bradford agreed to wait 7-10 days before contacting Intertops.

38. On September 6, 2011, a Federal Grand Jury Subpoena was served on Wells Fargo requesting specific bank records pertaining to Richard Craig Bradford.

39. On September 7, 2011, I received a telephone call from Bradford who stated that he had not received his requested wire payout from Intertops. Bradford stated that he would contact

14

Intertops to check the status and inform them he had not received his payout.

40. On October 13, 2011, a review of financial documents received from Wells Fargo identified the anticipated $865.00 deposit into Bradford's South Carolina Wells Fargo bank account #XXXXXXXXXXX. This $865.00 payment was credited to Bradford's account on September 20, 2011, and originated from Quebec at Bank of Canada through Wells Fargo into Bradford's bank account via the Automated Clearing House (ACH) system. Further investigation revealed that between September 26 and October 12, 2011, Bradford received two (2) additional payments via the ACH system totaling $2,897 from Quebec. ACH is a payments mechanism that replaces paper payments with electronic transactions. It is very similar to a wire transfer in that it is an electronic payment. Unlike a wire, ACH's are sent in "batch files." In this case, Bank of Canada, at the request of Quebec, sends an ACH "batch file" to Wells Fargo containing numerous electronic payments for beneficiary accounts in the United States. Wells Fargo acting as both the Originating Depository Financial Institution (ODFI) and the Gateway Operator receives the "batch file" from Bank of Canada, opens the file and executes the ACH payments by further crediting the beneficiary bank accounts.

41. On October 13, 2011, I received the information below from Wells Fargo ACH department via Grand Jury Subpoena which specifically identifies the originator of these three (3) payouts from Intertops into Bradford's South Carolina Wells Fargo account.

Post – 09/20/11 $865.00

2nd addenda - 9221-8742 **QUEBEC INC** 3100 BOUL CONCORDE C.P. 41036

3rd addenda - LAVAL *QC\ H7E 2B8\

Post – 9-23-11 $1,697.00

2nd addenda - -9221-8742 **QUEBEC INC** 3100 BOUL CONCORDE C.P. 41036

3rd addenda - -LAVAL *QC\ H7E 2B8\

Post – 10/12/11 $1,200.00

2nd addenda - 9221-8742 **QUEBEC INC** 3100 BOUL CONCORDE C.P. 41036

3rd addenda - LAVAL *QC\ H7E 2B8\

42.  On October 13, 2011 I spoke with Bradford who verified that he received the (3) three listed payouts in his Wells Fargo account and that they represented gambling proceeds from his betting on sports using the Intertops website.

43.  Using both open source and law enforcement databases I was unable to identify any legitimate business for Quebec. A review of various financial documents identified that between October 6, 2005, and June 3, 2011, Quebec sent or received 259 wires through United States banks totaling $15,238,354.78. The wires were sent through numerous foreign banks in a nesting relationship with no apparent reason. Based on my training and experience, this movement of money through multiple bank accounts is typical money laundering behavior. Furthermore, there exists a direct relationship between Quebec and at least (2) current targets of separate Secret Service investigations involving money laundering.

44.  In 2010, the Secret Service and law enforcement partners in Washington State conducted an investigation into an unlicensed money transmitting business in the United States involving Arrow Checks. Arrow Checks processed in excess of $20 million of illegal gambling proceeds on behalf of Pokerstars, Ultimate Bet and other gaming websites to United States players using checks drawn on U.S. banks.    Quebec was a primary funding source for Arrow Checks. The result of this case was an uncontested seizure of over $5.1 million.

45.  Through continued investigation, including numerous interviews, venue was established in the District of South Carolina. On October 14, October 28, and November 10, 2011, this Court issued warrants directing the seizure of all monetary ACH Payments originating from Bank of Canada sent on behalf of 9221-8742 Quebec through Wells Fargo. From October 14 through November 9, 2011,

16

Wells Fargo seized $882,212.61 sent from Bank of Canada. Upon information and belief, 9221-8742 Quebec was made aware of the warrants and ceased making ACH Payments. Based on interviews and investigation the operators of Intertops began utilizing Denarius to process payouts for gamblers in the United States and the District of South Carolina.

## INVESTIGATION REGARDING Denarius Financial Group

46. On January 10, 2012, I conducted a financial review of documents received from PNC Bank N.A. via Grand Jury Subpoena.

47. Nightshift Novelties Inc. ("Nightshift") account # 1207137383 at PNC Bank was opened on July 5, 2011 at Branch #001-721 located at 200 E Broward Blvd in Ft. Lauderdale, FL, 33001. Mauro Basso is the authorized signer on the account. Per internet research on the name, Nightshift claims to be a wholesaler of party supplies. The account remained dormant through mid-September. A review of the account determined the activity was not consistent of a wholesale party supplier, but showed signs of a third party processor of gambling funds.

48. From September 1, 2011, through December 27, 2011, 223 outgoing checks totaling $346,705.87 were cleared. The checks ranged in amounts of $100.01 - $3,000.29 which is typical of check processors making gambling payouts. Most sports betting websites like www.intertops.com, and other gambling websites require a minimum check payout of $100.

49. Investigation revealed that the Nightshift account was funded by 9 incoming wires totaling $342,845 all from account # 329681005131 titled Denarius Financial Group held at Key Bank (New York account). These 9 funding wires ranged in amounts from $30,006.00 - $47,860.00 and occurred between September 7 and November 25, 2011.

50. Investigation revealed that Robert Stephen Kilgore who resides at XXXXXXXXXXX, XXXXXX, SC, received a check from Nightshift dated November 16, 2011, in the amount of $2,200.07. Kilgore has been previously interviewed by Secret Services Agent(s) and admitted to

17

being a prolific sports gambler who uses the Intertops website to place wagers and that he frequently receives payouts from his gambling activity.

51. Investigation revealed that Richard Craig Bradford who resides at 182 XXXXXXX, XXXXXXX, SC, received a check from Nightshift dated November 3, 2011, in the amount of $1,250.24. Bradford has been previously interviewed by Secret Service Agent(s) and admitted to being a prolific sports gambler, utilizing the Intertops website to place wagers, and receiving payouts.

52. Beginning on January 10, 2012, my investigation turned to Denarius and I conducted a detailed financial review of Denarius based on documents received from Key Bank N.A. via Grand Jury Subpoena.

53. From June 15, 2011, through December 19, 2011, using Key Bank account #329681005131, Denarius sent $5,676,556.88 to no fewer than nine (9) U.S. bank accounts of known gambling processors which have either been seized by the USSS, or are currently active targets of ongoing USSS investigations. The nine (9) targets include: Morningstar Party Supplies Inc. (Morningstar), Lingo Novelties Inc. ("Lingo"), Sterling Expressions Inc. ("Sterling"), Guru Novelty Wholesale Inc. ("Guru"), Nightshift, Nunavik Art Enterprises ("Nunavik"), Millgreet Industries Inc. ("Millgreet"), Bonodam Enterprises ("Bonodam"), and Epsilist Inc. ("Epsilist").

54. In July 2011, the USSS – Wilmington Resident Office – began an official investigation into the financial activities of Morningstar, Guru, Lingo, Sterling, and others. Their investigation revealed that the four (4) entities and others facilitated the distribution of funds on behalf of websites that host online gambling activities. These entities remitted hundreds of payments in the form of checks to gamblers located throughout the United States and were funded via wire by Denarius. The transfer of funds in the form of checks and monetary wire transfers were shown to contain proceeds of illegal online gambling in violation of 18 U.S.C. § 1084. Pursuant to 18 U.S.C. § 1956(c)(7), a violation of 18 U.S.C. 1084, which is included as a RICO predicate in 18 U.S.C. 1961(1), is a "specified unlawful

18

activity." Furthermore, on December 5, 2011, the USSS, Wilmington Resident Office executed Seizure Warrants obtained from a Magistrate Judge in the Eastern District of North Carolina for numerous bank accounts, including those controlled by Morningstar, Guru, Lingo and Sterling. The result was a seizure of $719,251.20

55. In November and December 2011, Undercover Secret Service Agent(s) in the Miami Field Office have gambled at foreign based websites, including www.intertops.com (now www.intertops.eu), and www.truepoker.eu and received checks representing gambling proceeds. One check was received from Bonodam on December 28, 2011, in the amount of $154.93 drawn upon Compass Bank. This case is currently being worked by USSS Agents in Miami.

56. On or about July 2011, the USSS, Chicago Field Office began an investigation into the financial activities of Nunavik. Their investigation revealed that Nunavik facilitated the distribution of funds on behalf of websites that host online gambling activities. Nunavik remitted hundreds of payments in the form of checks to gamblers located throughout the United States and was funded via wire by Denarius. The transfer of funds in the form of checks and monetary wire transfers were shown to contain proceeds of illegal online gambling in violation of 18 U.S.C. § 1084. Pursuant to 18 U.S.C. § 1956(c)(7), a violation of 18 U.S.C. § 1084, which is included as a RICO predicate in 18 U.S.C. § 1961(1), is a "specified unlawful activity". Furthermore, on October 12 and 13, 2011, the USSS, Chicago Field Office executed Seizure Warrants obtained from a Magistrate Judge in the Northern District of Illinois for two (2) bank accounts controlled by Nunavik. The result was a seizure of $ 114,006.00.

57. A review of financial documents regarding Millgreet, the target of the USSS, Miami Field Office, revealed that Mauro Basso, who also opened Nightshift and Guru accounts in Florida, was the account holder of a Millgreet account at BankAtlantic in Florida. Millgreet has been funded by Denarius and from October 19, 2011, through November 25, 2011, the Millgreet account at

19

BankAtlantic remitted 348 checks ranging from $20.22 to $3,000.28 totaling $519,173.57.

58. In April 2011, the U.S. Attorney for the Southern District of New York filed a complaint and an indictment (as well as numerous seizure warrants) that alleged that certain RBC accounts for Terricorp were used in connection with violation of the Unlawful Internet Gaming Enforcement Act (UIGEA). At the time, Epsilist held an account at Royal Bank of Canada listing the address in Ste-Catherine, Quebec, which is a suburb of Montreal located near the Kahnawake Reservation. The Kahnawake reservation is home to the Kahnawake Gaming Commission which regulates numerous online gambling sites in addition to casinos located on the reservation. A review of Epsilist account activity revealed that in October 2010 through April 2011 they processed 357 checks to individuals throughout the U.S. and received wires totaling $4,890,023.51. Check recipients included Michael Simms, Eric Mutrie, and Kenneth Frye. Poker profiles were located for each aforementioned individual on the website, www.pokerpages.com.

59. From August 2011 through and October 2011, Undercover Secret Service Agent(s) in the Greenville Resident Office have gambled at foreign based websites, including www.betonline.com, www.sbgglobal.com and www.cakepoker.eu and received check(s) representing gambling proceeds. One check was received from Nightshift on December 5, 2011, in the amount of $600.80 drawn upon Citibank NA account # XXXXXXXXXXXXX and signed by Mauro Basso. This check represents proceeds from gambling at www.cakepoker.eu. Working with USSS Agents from Chicago and Miami no fewer that six Nightshift accounts opened by Basso were identified and various banks in the U.S. Nightshift accounts have been funded by Denarius. USSS Agent(s) have currently presented an affidavit in support of seizure warrants in the Southern District of Florida. Seizure warrant(s) and an indictment of Mauro Basso are pending.

60. In June 2011, Denarius funded account(s) of Morningstar, Lingo, Sterling and Guru with four (4) wires totaling $123,782.88.

20

61. In July 2011, Denarius funded account(s) of Lingo, Nightshift, Nunavik, and Sterling with seven (7) wires totaling $297,596.00.

62. In August 2011, Denarius funded Nunavik, Guru, and Morningstar with three (3) wires totaling $133,710.00.

63. In September 2011, Denarius funded account(s) of Morningstar, Lingo, Guru, Nightshift, Millgreet, and Epsilist with thirty (30) wires totaling $1,313,602.00.

64. In October 2011, Denarius funded account(s) of Morningstar, Lingo, Guru, Nightshift, Millgreet, Bonodam, and Epsilist with seventy-two (72) wires totaling $2,018,244.00.

65. In December 2011, Denarius funded account(s) of Morningstar, Lingo, Nightshift, Millgreet, Bonodam, and Epsilist with seventeen (17) wires totaling $553,947.00

66. Included as an attachment to this affidavit is a spreadsheet with each individual wire payments made by Denarius to the nine (9) known processors from June 2011 through December 2011.

## HISTORICAL INFORMATION ON Denarius Financial Group.

67. The following investigation was conducted by me, USSS Criminal Research Specialist (CRS) Roberson and USSS CRS Mendoza. Multiple databases, including those discussed in this paragraph, were utilized. Accurint is a database used to search for information relating to businesses and assets. Dun and Bradstreet is a database used to search for domestic and limited international business information. Lexis Nexis is a database used to obtain information for individuals, businesses, assets and court information. Merchant Risk is a database used to locate information on subject email addresses, IP addresses, and phone numbers. Department of Treasury, IRS, database is used to verify Registration of Money Services Business. Additional open source tools including Google, Yahoo, and various search engines were also used.

21

68. On January 25, 2012, through an official record request, the Department of Treasury, IRS, concluded that there was no FinCEN Form 107 or TD F90-22.55, Registration of Money Services Business, (MSB) in the U.S. for Denarius Financial Group.

69. The company maintains a website www.denarius.com and lists an address of 1179, Rue de la Montage, Suite 101, Montreal Quebec H3G 1Z2. According to their website they offer corporate foreign exchange services to shield businesses from losing money when foreign exchange rates fluctuate. This company made headlines in 2002 when a Canadian attorney, Simon Rosenfeld (who used to be a banker in Italy), admitted that he ran pump-and-dump schemes. Rosenfeld and others created multiple corporations, shell/shelf companies, and bank accounts in the Bahamas. In June 2002, Rosenfeld admitted to having washed $250,000.00 for a Miami drug dealer by flying from Toronto to Miami, taking the money back to Canada to Denarius Financial Group, and via three wire transfers sent the money back to Florida. He was tried in 2005 and sentenced to three years in jail.

70. In March 2011, Keybank (U.S.) reported that Denarius Financial has been used by many fraudsters conducting varius scams (lottery, telemarketing, etc.)

71. According to archive Canadian News, in August 2009, Rosenfeld was again sentenced to 5 years imprisonment for his continued role in international money laundering.

72.    In 2006, Denarius Financial Group was a listed exhibitor (along with Superior Poker, Poker Life Magazine, Purple Lounge, Association of Professional Casino and 38 other companies), in the Casino Affiliate Convention.

73. According to the Casino Affiliate Convention L.D.C. which is the gaming affiliate network for InterCasino U.S., Intercasino European, InterCasino Poker, InterBingo, and VIP Casino, Denarius Financial Group offers a proven way to make website payments and most competitive sliding scale commission structure available with innovative attractive affiliate partner incentive schemes.

22

74. USSS Agents have had conversations with U.S. bank officials who have confirmed that just like individual accounts, both domestic and foreign corporate accounts require an extensive application and agreement(s) signed by the company representatives. These banking agreements included non-permissible banking practices, which specifically cover bank fraud and money laundering. Officials at Key Bank have stated that if they had been aware of the nature of the money in the Denarius bank account and the incoming and outgoing wires, they would not have processed the transactions nor would they continue their relationship with Denarius.

## JURISDICTION AND VENUE

75. This Court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355.

      a) Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of South Carolina.

      b) Venue is further proper pursuant to Title 28, United States Code, Section 1395(a) because the cause of action accrued in the District of South Carolina.

76. Venue is further proper pursuant to Title 18, United States Code, Section 1956(i) because the financial or monetary transactions were conducted in part in the District of South Carolina; because a prosecution for the underlying specified unlawful activity could be brought in the District of South Carolina and the Defendants participated in the transfer of the proceeds of the specified unlawful activity from this District to districts where financial and monetary transactions were conducted; and because the Defendants conspired to violate Section 1956 and venue for the

23

completed offense lies in the District of South Carolina and acts in furtherance of the conspiracy took place in the District of South Carolina.

77.    From July 9, 2009, through June 9, 2011, a minimum of thirty-seven (37) wires totaling $49,920 have been received by what the affiant believes are online gamblers residing in the District of South Carolina from IGE.

## INTERVIEWS OF GAMBLERS IN THE DISTRICT OF SOUTH CAROLINA

78.    After conducting a financial investigation of IGE in relation to the amount of wires sent to United States based customers, potential District of South Carolina gamblers were identified and interviewed.

79.    On August 24, 2011, Special Agent Sean Sojack attempted to interview Liam Kevin McCauley at his residence located at XXXXXX, XXXXXX.  McCauley was not home but his wife verified this as his home address provided Agent Sojack with his work telephone number.  Agent Sojack contacted McCauley, obtained his work address and drove to his office located at XXXXX, XXXXXX. Agent Sojack met with McCauley who acknowledged that he received 5 wires from International General Enterprises Limited between July 29, 2009, and October 13, 2010, totaling $13,200 in his Wachovia Bank account.   McCauley stated that all wires were proceeds of online gambling (a winning withdrawal) and that he has recently quit playing.  McCauley did not provide a specific website(s) he used to gamble.

80.  On November 25, 2011, McCauley received a $4,250.00 wire from Avencia World Limited. A seizure warrant was signed by a Magistrate Judge in the District of South Carolina on January 12, 2012, for wires sent into the U.S. by Avencia World Limited, through Deutsche Bank and Bank of New York Mellon. These warrants resulted is the seizure of approximately $707,000.00 (the final numbers pending from banks).

81.    On August 24, 2011, your affiant attempted to contact Jon A. Leonardi at his listed

24

home telephone number, XXXXXXXXXX. I left a message requesting Leonardi return my call. Within 1 hour I received a call from Leonardi who stated his wife received my message at his residence and passed it to him. Leonardi stated his address of XXXXXXX, XXXXXXXXX. Leonardi confirmed that he received approximately 17 wires between July 29, 2009, and May 6, 2011, totaling approximately $25,301 from International General Enterprises Limited in his First Federal Savings and Loan bank account. Leonardi stated that all wired funds he received from IGE were proceeds from betting on sports via the website www.intertops.com. Leonardi stated that he only gambles at that website where he maintains an account and they were quick to wire him his winnings within a few days (a winning withdrawal).

82.    On August 24, 2011, your affiant attempted to contact Robert Stephen Kilgore at his listed home telephone number, XXXXXXXXXX. I left a message requesting that Kilgore return my call. Within 1 hour I received a call from Kilgore who stated he just received my message. Kilgore stated his address of XXXXXXXX, XXXXXXXXX. Kilgore confirmed that he received 2 wires between May 17, 2010, and March 12, 2011, totaling approximately $3,615 from International General Enterprises Limited in his Wachovia Bank Account. Kilgore stated that all wired funds received from IGE were proceeds from gambling online via the website www.intertops.com. Kilgore stated that he only plays casino type games and that he receives his funds within several days (a winning withdrawal).

83.    On August 26, 2011, I telephonically interviewed Richard Craig Bradford who verified he resides at 182 Fairway Drive, Edgefield, SC. Bradford verified that he established and maintains Wells Fargo bank account #1003295023717 which is a South Carolina bank account. Bradford stated that over the last several years he has gambled online--betting on sports—and that he uses the Intertops website to place his wagers. Bradford confirmed that between July 9, 2011, and June 9, 2011 he has received no less than 29 wires from IGE in excess of $28,560.03 which represents

winnings from online gambling. Bradford stated that on August 26, 2011, he received a wire in his account from IGE in the amount of $820.00 which was a payout for betting on sports using Intertops.

84. On August 29, 2011, I spoke with Bradford who stated he requested another payout from Intertops on August 26, 2011. Bradford said that after the processing fee the total payment he expected to be wired to his account was $865.00. I explained to Bradford that due to an active seizure warrant he would not receive this wire from Intertops. I explained to Bradford that if he waited approximately 7-10 days and then contacted Intertops questioning where his payout was that they would in fact resend it, likely using a different method and/or processor. Bradford agreed to wait 7-10 days before contacting Intertops.

85. Paragraphs 38 through 42 of this Affidavit are incorporated by reference as if fully restated herein.

86. On November 25, 2011, Bradford received a $1,500.00 wire from Avencia World Limited. A seizure warrant was signed by a Magistrate Judge in the District of South Carolina on January 12, 2012, for wires sent into the U.S. by Avencia World Limited, through Deutsche Bank and Bank of New York Mellon. These warrants resulted is the seizure of approximately $707,000.00 (the final numbers pending from the banks).

87. On November 21, 2011, Robert Stephen Kilgore who resides at XXXXXXXX, XXXXXX deposited a check from Nightshift Novelties dated November 16, 2011, in the amount of $2,200.07 into his Bank of America account #XXXXXXXXXXXX. Kilgore has been previously interviewed by Secret Services Agent(s) and admitted to being a prolific sports gambler and utilized the Intertops website to place wagers and received payouts. On January 19, 2012, Anti Money Laundering (AML) officials at Bank of America verified that Kilgore's Bank of America account is a South Carolina account.

88. On November 9, 2011 Richard Craig Bradford who resides at XXXXXX, XXXXXX,

26

deposited a check from Nightshift Novelties dated November 3, 2011, in the amount of $1,250.24 into his SunTrust Bank account # 1000139937766. Bradford has been previously interviewed by Secret Service Agent(s) and admitted to being a prolific sports gambler who uses the Intertops website to place wagers and received payouts.

## CONCLUSION

89. As previously referenced, 18 U.S.C. § 981(b)(3) provides that a "seizure warrant may be issued…by a judicial officer in any district in which a forfeiture action against the property may be filed under Section 1335(b) of Title 28, and may be executed in any district in which the property is found." According to 28 U.S.C. § 1355(b), a forfeiture action may be brought in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred".

90. Therefore, based on the aforementioned facts and your Affiant's training and experience, your Affiant believes probable cause exists that the property described in the "Property To Be Seized" section of this affidavit is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C) as property derived from proceeds traceable to violations of 18 U.S.C. § 1960(a) – Operating an Unlicensed Money Transmitting Business; 18 U.S.C. § 1084(a) – Transmission of Wagering Information; 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) – Money Laundering; 18 U.S.C. § 1344 – Bank Fraud; and 18 U.S.C. § 1955 – Conduct of Illegal Gambling Business. Property subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) may be seized pursuant to 18 U.S.C. §§ 981(b) and, thus it is respectfully requested that warrants be issued to seize the property.

91. Further, your Affiant believes, based on the foregoing, that there is probable cause to believe that Denarius Financial Group committed, and aided and abetted the commission of, violations of 18 U.S.C. § 1960(a) – Operating and Unlicensed Money Transmitting Business; 18

27

U.S.C. § 1084(a) – Transmission of Wagering Information; and 18 U.S.C. § 1967(a)(1)(A)(i) and 1956(a)(1(B)(i) – Money Laundering; 18 U.S.C. § 1344 – Bank Fraud; and 18 U.S.C. § 1955 – Conduct of Illegal Gambling Business. Pursuant to 18 U.S.C. §§ 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of the money laundering statutes (§1956) or in violation of the money transmitting statutes (§1060) is subject to forfeiture to the United States, as is any property traceable to such property.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

James B. Motley, Jr.
United States Secret Service
Greenville Resident Office

Sworn to and subscribed before me this
___ day of _____, 2011.

JACQUELYN D. AUSTIN
UNITED STATES MAGISTRATE JUDGE

28

# Denarius Financial Group - Key Bank Account # 329681005131

|  | June |
|---|---|
| Total Deposits | $19,215,950.60 |
| 6/15 - Morningstar | $34,810.00 |
| 6/15 - Lingo Novelties | $31,217.00 |
| 6/15 - Sterling Express | $29,611.00 |
| 6/15 - Guru Novelty | $28,144.88 |
|  | $123,782.88 |

|  | July |
|---|---|
| Total Deposits | $18,207,276.56 |
| 7/6 - Lingo Novelties | $51,115.00 |
| 7/6 - Nightshift Novelties | $47,982.00 |
| 7/6 - Lingo Novelties | $42,624.00 |
| 7/13 - Nunavik Enterprises | $44,650.00 |
| 7/13 - Nunavik Art Enterprises | $38,965.00 |
| 7/13 - Lingo Novelties | $37,035.00 |
| 7/13 - Sterling Express | $35,225.00 |
|  | $297,596.00 |

|  | August |
|---|---|
| Total Deposit | $17,440,777.35 |
| 8/3 - Nunavik Art Enterprises | $52,085.00 |
| 8/3 - Guru Novelty | $44,570.00 |
| 8/3 - Morningstar | $37,055.00 |
|  | $133,710.00 |

|  | September |
|---|---|
| Total Deposits | $19,510,777.25 |
| 9/6 - Lingo Novelties | $52,375.00 |
| 9/6 - Morningstar | $49,950.00 |
| 9/6 - Guru Novelty | $48,999.00 |
| 9/6 - Nightshift Novelties | $48,700.00 |
| 9/6 - Lingo Novelties | $45,510.00 |
| 9/7 - Morningstar | $43,650.00 |
| 9/7 - Millgreet Industries | $41,775.00 |
| 9/7 - Nightshift Novelties | $37,800.00 |
| 9/7 - Nightshift Novelties | $36,996.00 |
| 9/7 - Morningstar | $22,060.00 |
| 9/7 - Epsilist Inc. | $54,820.00 |
| 9/15 - Lingo Novelties | $45,825.00 |
| 9/15 - Lingo Novelties | $44,350.00 |
| 9/15 - Guru Novelty | $42,575.00 |
| 9/15 - Morningstar | $37,400.00 |
| 9/19 - Millgreet Industries | $47,402.00 |

| | |
|---|---|
| 9/19 - Nightshift Novelties | $42,175.00 |
| 9/19 - Morningstar | $41,822.00 |
| 9/19 - Morningstar | $39,699.00 |
| 9/19 - Nightshift Novelties | $37,484.00 |
| 9/23 - Lingo Novelties | $48,660.00 |
| 9/23 - Morningstar | $45,730.00 |
| 9/23 - Nightshift Novelties | $37,010.00 |
| 9/23 - Nightshift Novelties | $35,665.00 |
| 9/23 - Millgreet Industries | $35,500.00 |
| 9/29 - Millgreet Industries | $48,125.00 |
| 9/29 - Morningstar | $46,310.00 |
| 9/29 - Nightshift Novelties | $44,200.00 |
| 9/29 - Guru Novelty | $42,000.00 |
| 9/29 - Epsilist Inc. | $69,035.00 |
| | $1,313,602.00 |

**October**

| | |
|---|---|
| Total Deposits | $13,988,142.90 |
| 10/6 - Morningstar | $41,250.00 |
| 10/6 - Nightshift Novelties | $37,080.00 |
| 10/6 - Millgreet Industries | $35,650.00 |
| 10/6 - Lingo Novelties | $32,110.00 |
| 10/6 - Epsilist Inc. | $44,670.00 |
| 10/7 - Lingo Novelties | $47,890.00 |
| 10/7 - Nightshift Novelties | $46,975.00 |
| 10/7 - Morningstar | $45,700.00 |
| 10/11 - Millgreet Industries | $48,225.00 |
| 10/11 - Nightshift Novelties | $45,200.00 |
| 10/11 - Morningstar | $44,175.00 |
| 10/11 - Epsilist Inc. | $61,065.00 |
| 10/14 - Millgreet Industries | $45,995.00 |
| 10/14 - Nightshift Novelties | $43,475.00 |
| 10/14 - Lingo Novelties | $41,650.00 |
| 10/14 - Bonodam Enterprises | $40,900.00 |
| 10/17 - Lingo Novelties | $38,050.00 |
| 10/17 - Morningstar | $36,500.00 |
| 10/17 - Guru Novelty | $32,910.00 |
| 10/17 - Morningstar | $32,420.00 |
| 10/17 - Nighshift Novelties | $30,275.00 |
| 10/17 - Epsilist Inc. | $45,315.00 |
| 10/20 - Nightshift Novelties | $36,000.00 |
| 10/20 - Millgreet Industries | $34,750.00 |
| 10/20 - Morningstar | $32,655.00 |
| 10/20 - Epsilist Inc. | $35,995.00 |
| | $1,056,880.00 |

| November | |
|---|---|
| Total Deposits | $13,459,264.71 |
| 11/1 - Guru Novelty | $41,325.00 |
| 11/1 - Morningstar | $40,640.00 |
| 11/1 - Nightshift Novelties | $39,475.00 |
| 11/1 - Lingo Novelties | $39,140.00 |
| 11/1 - Millgreet Industries | $38,200.00 |
| 11/1 - Epsilist Inc. | $54,360.00 |
| 11/4 - Millgreet Industries | $42,605.00 |
| 11/4 - Bonodam Enterprises | $41,790.00 |
| 11/4 - Nightshift Novelties | $38,900.00 |
| 11/4 - Nightshift Novelties | $36,525.00 |
| 11/4 - Lingo Novelties | $34,810.00 |
| 11/4 - Epsilist Inc. | $50,175.00 |
| 11/9 - Morningstar | $46,000.00 |
| 11/9 - Guru Novelty | $45,500.00 |
| 11/9 - Morningstar | $45,350.00 |
| 11/9 - Millgreet Industries | $45,150.00 |
| 11/9 - Lingo Novelties | $41,850.00 |
| 11/9 - Epsilist Inc. | $71,000.00 |
| 11/15 - Nightshift Novelties | $45,100.00 |
| 11/15 - Millgreet Industries | $44,250.00 |
| 11/15 - Bonodam Industries | $43,500.00 |
| 11/15 - Lingo Novelties | $43,250.00 |
| 11/15 - Morningstar | $41,900.00 |
| 11/15 - Epsilist Inc. | $82,610.00 |
| 11/16 - Nightshift Novelties | $47,860.00 |
| 11/16 - Lingo Novelties | $43,999.00 |
| 11/16 - Nightshift Novelties | $43,075.00 |
| 11/17 - Morningstar | $41,125.00 |
| 11/17 - Guru Novelty | $40,602.00 |
| 11/17 - Millgreet Industries | $31,250.00 |
| 11/17 - Epsilist Inc. | $65,525.00 |
| 11/22 - Nightshift Novelties | $46,350.00 |
| 11/22 - Morningstar | $45,880.00 |
| 11/22 - Lingo Novelties | $44,525.00 |
| 11/23 - Morningstar | $43,950.00 |
| 11/23 - Lingo Novelties | $42,895.00 |
| 11/23 - Guru Novelty | $40,800.00 |
| 11/25 - Millgreet Industries | $31,030.00 |
| 11/25 - Nightshift Novelties | $30,006.00 |
| 11/25 - Epsilist Inc. | $54,700.00 |
| 11/28 - Morningstar | $44,350.00 |
| 11/28 - Bonodam Enterprises | $38,875.00 |
| 11/28 - Millgreet Industries | $34,600.00 |
| 11/29 - Nightshift Novelties | $43,025.00 |
| 11/29 - Morningstar | $33,617.00 |

| | |
|---|---|
| 11/29 - Epsilist Inc. | $36,800.00 |
| | $2,018,244.00 |

| | **December** |
|---|---|
| Total Deposits | $22,663,606.13 |
| 12/2 - Lingo Novelties | $48,125.00 |
| 12/2 - Lingo Novelties | $45,630.00 |
| 12/2 - Nightshift Novelties | $45,275.00 |
| 12/2 - Morningstar | $40,400.00 |
| 12/7 - Millgreet Industries | $43,660.00 |
| 12/7 - Bonodam Enterprises | $39,124.00 |
| 12/7 - Nightshift Novelties | $33,785.00 |
| 12/9 - Millgreet Industries | $38,035.00 |
| 12/9 - Epsilist Inc. | $89,525.00 |
| 12/14 - Nightshift Novelties | $25,889.00 |
| 12/14 - Nightshift Novelties | $20,777.00 |
| 12/15 - Millgreet Industries | $34,240.00 |
| 12/15 - Bonodam Enterprises | $32,530.00 |
| 12/15 - Morningstar | $27,092.00 |
| 12/19 - Millgreet Industries | $41,630.00 |
| 12/19 - Nightshift Novelties | $37,755.00 |
| 12/19 - Epsilist Inc. | $89,270.00 |
| | $732,742.00 |

| | |
|---|---|
| **Total for June through December** | **$5,676,556.88** |

**Denarius Financial Group - Key Bank Account # 329681005131**

| | June | July | August | September | October | November | December | Total |
|---|---|---|---|---|---|---|---|---|
| Morningstar | $34,810.00 | | $37,055.00 | $326,621.00 | $232,700.00 | $382,812.00 | $67,492.00 | $1,081,490.00 |
| Lingo Novelties | $31,217.00 | $130,774.00 | | $236,720.00 | $159,700.00 | $290,469.00 | $93,755.00 | $942,635.00 |
| Sterling Express | $29,611.00 | $35,225.00 | | | | | | $64,836.00 |
| Guru Novelty | $28,144.88 | | $44,570.00 | $133,574.00 | $32,910.00 | $168,227.00 | | $407,425.88 |
| Nightshift Novelties | | $47,982.00 | | $320,030.00 | $239,005.00 | $370,316.00 | $163,481.00 | $1,140,814.00 |
| Nunavik Art Enterprises | | $83,615.00 | $52,085.00 | | | | | $135,700.00 |
| Millgreet Industries | | | | $172,802.00 | $164,620.00 | $267,085.00 | $157,565.00 | $762,072.00 |
| Bonodam Enterprises | | | | | $40,900.00 | $124,165.00 | $71,654.00 | $236,719.00 |
| Epsilist Inc. | | | | $123,855.00 | $187,045.00 | $415,170.00 | $178,795.00 | |
| Total | $123,782.88 | $297,596.00 | $133,710.00 | $1,313,602.00 | $1,056,880.00 | $2,018,244.00 | $553,947.00 | |